SOUTHERN COFFEE MILLS, INC., v. WESTFELDT BROTHERS.

4-6471                                            155 S. W. 2d 704

Opinion delivered November 17, 1941.

*Rowell, Rowell & Dickey,* for appellant.

*Bridges, Bridges & Young* and *Henry W. Gregory, Jr.,* for appellee.

GRIFFIN SMITH, C. J. Westfeldt Brothers, a partnership engaged in the wholesale coffee business at New Orleans, procured judgment against Southern Coffee Mills, Inc., of Pine Bluff, for $1,177.43. Payment of $648.54 was immediately made, but an item of $445.50, with interest, is in dispute, contention being that the trial court erred in giving an instructed verdict for the amount in controversy. This appeal questions correctness of the court's action in respect of the $445.50 item.

August 29, 1939, appellees entered into a written contract to supply 600 bags of coffee of three different grades, shipment of 200 bags to be made in each of the first three months of 1940. Terms were cash, less 2 per cent. in ten days. Agreement was that upon failure of the buyer to make settlement according to contractual terms, Westfeldt Brothers had a right to resell the coffee or any part of it at public or private vendue "for account of the buyer."

It is appellant's contention that the jury should have been permitted to determine whether the sellers, through letters and telegrams, and by telephone conversations, prior to April 1, 1940, "advised or led the appellant to believe" that the contract of August 29 would be treated as not having been breached through failure of appellee

to pay for shipments. Six contracts were alleged in the complaint.[1]

February 16 and 28 shipments invoiced at $3,952.55 were made. Part of these obligations fell due ten days after the 28th.

February 29, March 11, March 12, and March 19 there were requests for settlement. No reply having been received to their telegram of March 19, appellees wrote an urgent letter March 23. In the meantime (March 22) appellant had written, enclosing check for $1,400. Specifications were given for a car of coffee, to be shipped March 27. Seventy-seven bags were referred to as new business, while 250 bags were to be shipped from contract commitments. There was the statement: "Upon arrival of the car we will mail check covering balance due, $2,555.30.[2] We trust this arrangement will be satisfactory and regret very much the necessity of having to ask you to handle in this manner."

This letter was replied to March 25. There was acknowledgment of the check, ". . . applying in part to our four outstanding invoices." There was this further statement: "We are sorry we cannot comply with your request for a further extension of these outstandings, as the bills in question are long overdue and we cannot reasonably give approval to the arrangements you now propose."[3]

March 26 Nash, for appellant company, telephoned appellees. He asked that shipments be made, and promised that (presumably at once) the old bills would be paid. Appellee sent the telegram shown in the footnote.[4] March 28 appellees telephoned appellants, and shortly

---

[1] August 29, 1939; November 3, 1939; December 21, 1939; January 31, 1940 (two contracts); March 15, 1940.

[2] After deducting $1,400 from $3,952.55 the difference was $2,-552.55. The balance of $2,555.30 referred to in the letter includes a "net cash item" of $2.75.

[3] There was the further statement: "All of our transactions are quite clearly understood to be on a ten-day discount basis; and, accordingly, we thought you would handle the shipments covered by our invoices of February 16 and 28."

[4] "Under circumstances sorry we cannot make shipment as suggested your telephone conversation."

thereafter confirmed the conversation in a letter printed as the fifth footnote.[5]

March 28 appellant wrote, referring to the telephone conversations. The account, he said, would be taken care of "shortly after the first of April." Shipment of 400 sacks of coffee, "all to apply against contract,"[6] was requested.

March 30 appellants replied, mentioning that the requested shipments were from contracts of August 29 and November 3, 1939. It was then said that, in conformity with previous communications, ". . . we cannot make shipments of coffees under these contracts because of your not having complied with the terms thereunder, as shown by invoices enumerated below, payment of which we must insist upon." The invoices were those showing a balance of $2,555.30.

April 1 appellant wrote appellees, stating that in the circumstances it seemed nothing could be done other than that appellees should sell the coffee for appellant's account, such sale to be ". . . at market price, and credit our account with the difference between contract price and market price."[7]

Appellees' reply was by letter dated April 4, in which it was said: "While your rights [under contracts of August 29 and November 3] have terminated, we are willing, if the matter is adjusted, to credit you with whatever market advance may be obtainable . . . At

---

[5] "Confirming our telephone conversation of today with regard to the balance due on our unpaid invoices, we regret the necessity for immediate payment and would further insist upon settlement this week, or not later than April 1. As we told you, we also had in mind the other bookings, consisting for the most part of deliveries that are now delinquent, and we must have some word from you as you mentioned would be given us in the next day or two about all these matters."

[6] Regarding the requested shipment it was said: "Please ship these coffees by Tennessee Bell next sailing, draft bill of lading attached, and draw through the Simmons National Bank, Pine Bluff."

[7] The letter contained this paragraph: "The contract price on Santos coffee seems to be about the same as today's market. However, the 450 bags [of] Victoria ⅞s [were] bought at ¾c per pound under today's market, and we should have credit for approximately $450." It was then said: "We shall appreciate your handling in this manner, and when we receive statement showing this credit, we shall forward check to you."

these prices the net difference would show a gain of $189.75, and if you will send us a check for bills you now owe us, less this amount, we will agree to 'ring out' these trades . . . Please reply immediately by wire upon receipt of this letter.''

The next communication was appellant's letter of April 9. Appellees, by air mail letter dated April 10, acknowledged receipt of check for $2,109.80, but returned it with the explanation that ''. . . we are unwilling to agree to your proposition.'' Photostatic copy of the check discloses the endorsement, ''For account in full to date.'' Insistence was that appellants owed $2,555.30, and ''. . . we are unwilling to renew our offer as set forth in letter of April 4, as you did not accept the same; and the market has, in the meantime, declined.''[8]

April 11, appellants wrote again, enclosing check for $2,109.80, ''. . . which we admit we owe you and do not want to pay any interest on this amount.''

This check was accepted April 13. In a letter of that date appellees referred to the fact that the first check was intended by appellants to be in full of their account, but, the second check not being so marked, ''. . . We understand your letter to mean that we can safely cash this check without prejudicing our right to recover from you the balance of the $2,555.30, with interest, which we claim is due us. . . .''

Appellant's contention is that by reason of correspondence, telegrams, and telephone calls, it was led to believe, or understood, that the contract of August 29 would be ''rung out;'' that is, the undelivered portion of the 600 bags would be sold in the open market for appellant's account, and the profit or loss charged or credited as the transaction developed.

There was proof that because of delay in arrival of an ocean-going vessel at New Orleans, a shortage occurred in the ''Victoria'' brand of coffee, attended by increases in price. Therefore, say appellants, when ap-

---

[8] The letter of April 4th, referred to, was the one in which it was suggested by appellees that the contract be liquidated by allowing appellants a credit of $189.75.

pellees, by telephone, suggested that the contract be "rung out," and appellants replied that the matter would be considered and appellees advised, ". . . and later did notify appellees and state that it was the only thing to be done under the circumstances, then appellant had the right for this circumstance of fact to be passed upon by a jury in order to determine if such a secondary agreement did in fact exist and in order to ascertain whether the appellant company had received 'the fruits of the contract,' and whether the appellee company, in writing on April 4, 1940, [and in its representations as to market conditions] evidenced good faith and fair dealing."

The court's finding was that by undisputed proof appellant had defaulted at the time the controversy arose relative to the credit of $445.50 contended for, and ". . . while an offer was made by Westfeldt Brothers to 'ring out' the contract at a profit of $189.75 [to appellant], this offer was not accepted."

We agree with the trial court. Failure by appellant to settle its account at a discount of two per cent within ten days gave appellees the right to resell the coffee for appellant's account. The contract had been breached before appellees proposed to sell at the then prevailing market price at a profit to appellants of $189.75. Appellant was not willing that this should be done.

The contract price on Victoria coffee was four and a half cents per pound. There is evidence that from April 1 to April 6 this brand was quoted at five and a half cents per pound; but there is also evidence of other values. Nash, who telephoned appellees, does not, by his evidence, establish a new contract, or a waiver by appellees of existing rights. His testimony is that Leonhardt, acting for appellees, called by telephone and asked when the overdue accounts would be paid. Nash testified: "I told him I would send [a check]. I don't remember exactly when—sometime in the very near future, because I felt like I could. Then he wanted to know what I was going to do about those contracts. . . . I said, 'well, I will have to think the matter over, and I will write you right away and let you know what I can do about it'.

. . . That is about all that was said in that conversation over the telephone."

A summary of transactions is this: Appellants were in default April 1, before prices advanced to a point where undelivered portions of the Victoria purchases could be resold for a profit. The contract was executory, title to the property remaining in appellees. Refusal by appellees to make additional shipments constituted a rescission they had a right to declare. Appellant did not want the coffee sold. This is evidenced by its insistance that shipments be continued. It is conceded that the item of $445.50 is due unless offset by profits appellees are presumed to have realized from sales not shown to have been made. Expresed differently, appellees are asked to pay $445.50 because they declined to perform a contract appellant had breached. The right of resale expressed in the contract is in the nature of an option available to the sellers. More than four months before any deliveries were to be made, and more than seven months before the last 200 bags were to be shipped, the sellers obligated themselves to deliver coffee at a fixed price; hence, their own commitments in the way of purchases had to be made. It was not only necessary that they should know the coffee would be taken, but it was likewise essential that payment be made at the times specified. The right of resale was retained, to be exercised if the buyer should fail to make settlement for delivered portions. The only question is whether appellants had a right, after default, to compel appellees to sell for their account. Since terms of the contract merely gave appellees the *right* to sell, but did not obligate them to do so, the trial court correctly instructed the jury to return a verdict for the plaintiff.

Affirmed.